SLIP OPINION

Cite as 2015 Ark. 289

# SUPREME COURT OF ARKANSAS

No. CV–15–126

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF W.L., A MINOR<br><br>DAVID LINEHAM<br>APPELLANT<br><br>V.<br><br>SARAH RACHEL HYDE ET AL.<br>APPELLEES | **Opinion Delivered** June 25, 2015<br><br>APPEAL FROM THE LOGAN COUNTY CIRCUIT COURT [NO. 42P PR–2009-98]<br><br>HONORABLE DAVID H. MCCORMICK, JUDGE<br><br><u>REVERSED AND REMANDED; COURT OF APPEALS OPINION VACATED</u>. |

**RHONDA K. WOOD, Associate Justice**

Under our guardianship statutes, a court may terminate a guardianship if it is no longer necessary or if it is in the ward's best interest. We hold that a guardianship is no longer necessary when a fit parent who consented to a guardianship revokes consent. Here, the circuit court's ruling that the father, David Lineham, was unfit was clearly erroneous. Therefore, the court should have granted David's petition to terminate a guardianship to which he had earlier consented. We reverse the order keeping the guardianship in place and remand for the court to enter an order terminating the guardianship and placing W.L. in David Lineham's custody.

I.     *Relevant Facts*

The relevant facts in this case were developed at hearings stemming from two petitions to terminate a guardianship. David Lineham and Sarah Hyde started dating in

2007. The two lived in a suburb of Washington D.C. in northern Virginia. Sarah became pregnant. Their child, W.L., was born in March 2008. At that time, David and Sarah lived with David's parents, but they moved into their own apartment in July 2009.

Sarah's parents, Dennis and Anna Hyde, also lived in the area. (The Hydes also had another home in Arkansas). In early fall of 2009, the Hydes had guardianship papers prepared and they presented them to David and Sarah for consent. David testified that he and Sarah consented to the Hydes' exercising a guardianship over W.L. so that W.L. would be able to have access to health insurance and daycare under Dennis Hyde's military benefits. W.L. continued to reside with David and Sarah. In December 2009, the Logan County Circuit Court entered an order appointing the Hydes as guardians over W.L. The Hydes eventually moved to Arkansas in July 2010. W.L. moved with them and has lived with Dennis and Anna ever since.[1]

David Lineham filed a petition to terminate the guardianship in December 2010, a year after the guardianship's inception and five months after the Hydes had moved to Arkansas. It took the circuit court over a year—until January 2012—to hold a hearing in the case.[2] At this hearing, David testified that he never intended to give up his parental rights to W.L. He also testified that in September 2010 he had married Danielle Lineham,

---

[1] Sarah initially moved with the Hydes to Arkansas, but ended up moving back to Virginia. She has subsequently returned to Arkansas.

[2] This court is disturbed by the length of time it took for the court to hold the hearing. Cases involving the placement of a child should be heard quickly to provide permanency for the child.

that both he and Danielle were employed, and that they shared a two–bedroom apartment. However, David also testified that he had visited W.L. only twice in Arkansas and that his telephone communication with her was sporadic. David also admitted that he had not provided the Hydes with any financial assistance since they had become W.L.'s guardians.

In April 2012, the circuit court entered an order denying David's petition and kept the guardianship in place. The court found that the guardianship was still necessary in order to maintain W.L.'s access to food, clothing, and financial support, which David had not provided. The court further found that David and his new wife Danielle "lack[ed] a meaningful relationship" with W.L. The court set a visitation schedule whereby David could visit W.L. in Arkansas and permitted W.L. to visit David in Virginia during the summer. David did not appeal from this order.

The present round of litigation started in October 2012 when Sarah, W.L.'s mother, filed a petition to terminate her parents' guardianship over W.L. David subsequently filed a second petition to terminate the guardianship. These motions were filed in the underlying guardianship case, which had been assigned to the probate division of the Logan County Circuit Court. Sarah also filed a petition for declaratory judgment and establishment of paternity, a case which had been assigned to the domestic-relations division of the same court. Eventually all parties—David, Sarah, and the Hydes (guardians)—agreed that Sarah would file a petition for custody in the domestic-relations

SLIP OPINION

case and that the case would then be consolidated into the probate matter. An order was entered to that effect in November 2012. David then filed a counterclaim for custody.

The circuit court held a two-day hearing in August 2013 to decide the consolidated petitions to terminate the guardianship and, if necessary, the petitions for custody. David testified that he and his wife still lived in Virginia. Since the last hearing, he had made eighteen trips to Arkansas to visit W.L. and had made multiple phone calls to her each week. David worked full-time at a car dealership, making a gross salary of between $5000 and $5500 per month. David's wife, Danielle, testified that she also worked full-time and made around $35,000 per year. In essence, David addressed the court's concern from the previous hearing that he lacked significant contact with his daughter and did not have a meaningful relationship with her.

Sarah testified that since the last hearing she had had another child and later married the father, William Lawson. Sarah had sporadic residency, but now lived in a trailer on the Hydes' property in Arkansas. She said she paid rent to her parents by "working on the farm." Neither she nor her husband owned a vehicle. She had a suspended driver's license in Virginia. She did not have a job and testified that she had $1.16 in her bank account. Finally, Sarah admitted that she had two felony drug convictions for possession of heroin and Dilaudid. Those convictions were in Virginia, where she was also facing a probation-revocation hearing the following month.

The court also heard testimony from Dennis and Anna Hyde. They testified that David had still not provided any financial support for W.L. while they had been her

4

guardians. Anna testified that David had done "all that he's been asked to do" and that "he's been an actively engaged father." She also stated that he had provided clothing and toys for W.L. and had developed a relationship with her. Despite this, both of the Hydes testified that they believed the guardianship was necessary in regards to David, but not as to their daughter, Sarah. In other words, they thought their guardianship should be terminated if the court were to return custody to Sarah; but if the court were to return custody to David, they thought their guardianship should stay in place.

After hearing the testimony, the court took the case under advisement and later issued a letter opinion and order. First, the court found that "from its previous ruling that David Lineham was determined to be unfit, although specific wording to that effect was not used." Second, the court found for the first time that Sarah was unfit and that David remained unfit. Finally, the court found that termination of the guardianship was not in W.L.'s best interest. Accordingly, the court kept the guardianship in place and denied and dismissed David and Sarah's petitions to terminate the guardianship and petitions for custody. David has appealed; notably, Sarah has not.[3]

## II.    *Termination of Guardianship*

Guardianships are special proceedings that are governed by statute. *Hetman v. Schwade*, 2009 Ark. 302, 317 S.W.3d 559. Under the guardianship statute, a guardianship can be terminated "[i]f, for any other reason, the guardianship is no longer necessary or for

---

[3] This case originally went to the court of appeals, which affirmed. *See In re Guardianship of W.L.*, 2015 Ark. App. 38, 454 S.W.3d 257. We granted a petition for review and, therefore, treat the case as if it had been originally filed here. *Goodloe v. Goodloe*, 2014 Ark. 300, 439 S.W.3d 5.

the best interest of the ward." Ark. Code Ann. § 28-65-401(b)(3) (Repl. 2012).

Termination-of-guardianship cases have been in a recent state of flux. We tried to bring some sense to this area of the law in *Graham v. Matheney*. However, while the *Graham* court acknowledged that termination-of-guardianship cases were governed by a disjunctive statute, it noted that if the ward is a child, the circuit court must still consider best interest, which has the effect of turning the test into a conjunctive one—the *or* becomes an *and*. 2009 Ark. 481, at 14–15, 346 S.W.3d 273, 281.

We attempted to clarify the guardianship analysis in *In re Guardianship of S.H. (1)*, 2012 Ark. 245, 409 S.W.3d 307 (*In re S.H. (1)*). There, we recognized and reaffirmed a fit parent's "fundamental liberty interest in the care, control, and custody of her child." 2012 Ark. 245, at 8–9, 409 S.W.3d at 313. The United States Supreme Court acknowledged this principle in *Troxel v. Granville*, 530 U.S. 57 (2000), and in accordance we have adopted a presumption that a fit parent acts in his or her child's best interest. *See, e.g.*, *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002).

The issue in *In re S.H. (1)* was whether a fit parent who consented to a guardianship had the burden to prove, under *Graham*, both prongs of the statutory test in order for the court to terminate the guardianship. We reasoned that "parents who have not been found unfit do not relinquish their fundamental liberty interest in raising their children by consenting to a guardianship." 2012 Ark. 245, at 14, 409 S.W.3d at 316. Accordingly, we adopted a two-step, burden-shifting procedure when a fit parent who consented to a guardianship later moves to terminate that guardianship:

6

> A natural parent who has not been deemed unfit is entitled to the presumption that he or she is acting in the child's best interest, even after consenting to a guardianship. Therefore, when a natural parent, who has not been deemed unfit and who has consented to a guardianship, files a petition to terminate that guardianship, that parent must put forth evidence that the guardianship is no longer necessary. Once the court is satisfied that the conditions necessitating the guardianship have been removed, the guardians shoulder the burden of rebutting the presumption that termination is in the child's best interest.

*Id.* at 15, 409 S.W.3d at 316. We remanded the case for the circuit court to reevaluate the case applying this procedure.

When that case returned to us after remand, we clarified the test in two ways. *See In re Guardianship of S.H. (2)*, 2015 Ark. 75, 455 S.W.3d 313 ("*In re S.H. (2)*). First, we said that a fit parent meets the burden that a guardianship is no longer necessary under the statute by revoking consent. *Id.* at 14, 455 S.W.3d at 322. Second, we said that the guardians can rebut this presumption by proving best interest by clear and convincing evidence. *Id.* We noted that this conjunctive burden-shifting test was inconsistent with the disjunctive statute, but nevertheless ruled that we were bound by the law-of-the-case doctrine. Ultimately, we reversed the circuit court's order keeping the guardianship in place and ordered the court to return the child to her mother, who was fit.

We are not bound by law of the case here and can return to the statute's plain language, which states that "a guardianship may be terminated by court order . . . [i]f, for any other reason the guardianship is no longer necessary or for the best interest of the ward." Ark. Code Ann. § 28-65-401(b)(3). Parents have a fundamental right to raise their children. We will not lightly intrude on this fundamental right. We have already said that a guardianship is no longer necessary once a fit parent revokes an earlier-given consent.

This is because a fit parent is presumed to be acting in the child's best interest. By petitioning to terminate the guardianship and revoking consent, the fit parent, who has the child's best interest at heart, informs the court that the guardianship is no longer necessary. That is sufficient to meet the statutory requirement where the court "may" terminate the guardianship. In other words, a guardianship is no longer necessary—per the statute—when a fit parent revokes consent. The fit parent does not have to prove anything else. The statute does contain another method for the guardianship to be terminated, that is, by showing it is no longer in the ward's best interest. However, given that the legislature has created a disjunctive test, the parent can move to terminate under either prong.

This ruling is consistent with the statutory text and a fit parent's fundamental liberty interest in the care, control, and custody of his or her child. Furthermore, the burden of proof does not and cannot shift to the guardians when a guardianship is terminated based on a fit parent's revocation of consent. Simply put, a fit parent's decision regarding his or her children is conclusive. *See Troxel*, 530 U.S. at 68–69 ("[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").

To the extent *Graham*, *In re S.H. (1)*, and *In re S.H. (2)* are in conflict with this decision, they are overruled. The judicially created tests from our past guardianship cases

SLIP OPINION

have moved termination-of-guardianship cases too far from the statute and, as *In re S.H. (2)* and this case have shown, result in circuit courts unnecessarily delaying the return of children to a fit parent's custody. For these reasons, it would be wrong to adopt the dissent's argument that we should affirm since the circuit court properly applied the then existing legal test and has unbridled discretion. There is a reason we review questions of fact, and sometimes, upon review, we are left with a definite and firm conviction that a mistake has been made. Such is the case here. In short, our judicially created, two-step tests are ineffective to protect a fit parent's fundamental rights and are divorced from the statutory text. The best path is to abandon the tests and bring termination-of-guardianship cases in line with the statute.

III.    *Discussion*

Here, the circuit court made two rulings regarding David's fitness. First, the court retroactively said David had been unfit at the first termination-of-guardianship hearing, although never mentioning it in its first order. Second, the court ruled that David continued to be unfit at the second termination-of-guardianship hearing. We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Devine v. Martens*, 371 Ark. 60, 263 S.W.3d 515 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* When reviewing the proceedings, we give due regard to the opportunity and superior position of

9

the probate judge to determine the credibility of the witnesses. *Id*. Both of the circuit court's findings regarding David's unfitness are clearly erroneous.

The court had no authority to retroactively declare David unfit. Here is an excerpt from the circuit court's letter opinion:

> An examination of the prior orders of this court . . . does not reveal that this court has expressly found either David Lineham or Sarah Hyde to be unfit. However, despite the arguments of David Lineham that no such finding has been made to him, the court believes that such a finding was made as to him in this court's letter opinion of February 28, 2012, (which was incorporated into the Order filed on April 9, 2012). Although the specific word unfit was not used, an examination of this court's letter opinion reveals [the contrary].

The court went on to note that, at the first hearing, it found that David had not provided food, clothing, or financial support to W.L. and did not demonstrate a meaningful relationship with W.L., although no court had ordered him to provide support nor did the Hydes request it. These findings, according to the circuit court, are "clearly a finding[] of unfitness, even if not so worded." In short, the court ruled in its November 2013 order that its April 2012 order contained a finding of unfitness.

Under Arkansas Rule of Civil Procedure 60(a), the circuit court may modify or vacate an order or judgment "[t]o correct errors or mistakes or to prevent the miscarriage of justice . . . within ninety days of it having been filed with the clerk." The court, therefore, loses jurisdiction to modify an order under Rule 60(a) unless it does so within ninety days. *Slaton v. Slaton*, 330 Ark. 287, 956 S.W.2d 150 (1997).[4] For example, in

---

[4] The court has the power to set aside an order or judgment after ninety days if one of seven conditions is present. Ark. R. Civ. P. 60(c). None of these conditions is at issue in this case.

*Slaton*, by a September 1991 divorce decree the court originally granted the father sole custody; however, in March 1992, the court modified the decree by declaring that the father and mother would share joint custody. We reversed, holding, in part, that the court "did not have jurisdiction to enter its March 5, 1992 order pursuant to Ark. R. Civ. P. 60." *Id*. at 296, 956 S.W.2d at 154. Likewise, in this case, the court did not have jurisdiction to modify the April 2012 order via its November 2013 order. In short, the circuit court could not retroactively declare David unfit.[5]

The court also held in its second order that David "remains unfit as a parent." This finding is clearly erroneous. The court outlined the specific reasons for this finding in its letter opinion, reasons that include the following:

- David refused to sit with the Hydes during W.L's kindergarten graduation ceremony;

- David testified that he had spent $8000 on W.L. during his visits to Arkansas, yet Dennis Hyde testified that David had offered no financial support for W.L.'s medical bills;

- David had set up an online dating account at "Fet Life," which included a listing of his (perfectly legal) sexual interests;

- Danielle testified that she had made two calls to the DHS hotline regarding W.L. and had also made two calls about Sarah's status as a fugitive;

---

[5] We are aware that guardianships are special proceedings and are generally exempt from the Rules of Civil Procedure under Rule 81(a). *See Swenson v. Kane*, 2014 Ark. 44, 447 S.W.3d 118. However, Rule 81(a) states that the rules shall not apply only where the statute provides a "different" procedure. *Norton v. Hinson*, 337 Ark. 487, 989 S.W.2d 535 (1999). Here, no guardianship or probate statute provides a different procedure, so Rule 60 applies. *Cf. Bullock v. Barnes*, 366 Ark. 444, 236 S.W.3d 498 (2006) (reversing order reopening probate case based, in part, on Ark. R. Civ. P. 60(a)).

SLIP OPINION

- David blocked calls from Sarah, and Danielle refused to have coffee with Sarah;

- David refused to provide the Hydes with medical documentation regarding medical treatment W.L. had received during one of her summer trips to Virginia;

- David lied to Dennis about their travel plans with W.L. during a winter storm, and David also told W.L. to lie to Dennis about these plans;

- During the hearing, David seemed uninterested in Sarah's testimony, which, according to the court, was consistent with his failure to communicate with them regarding W.L.

None of these facts calls into question David's fitness as a parent. Fitness, in this context, has an imprecise definition. In *Troxel*, the Court suggested that a parent is fit if he or she "adequately cares for" the child. *Troxel*, 530 U.S. at 68. In other cases, we have said the following: "Courts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life." *Lloyd v. Butts*, 343 Ark. 620, 624, 37 S.W.3d 603, 606 (2001) (citing *Holmes v. Coleman*, 195 Ark. 196, 111 S.W.2d 474 (1937)).

At the second hearing, David addressed every concern the court had at the first hearing. Anna Hyde even testified that David had done everything the court had asked him to do at the first hearing. There were no facts to suggest that David was an unfit or improper parent. The court's concerns do not deal with David's ability to adequately care for W.L. or indicate an intention by David to fail to discharge his duties as a parent; instead, most related to David and Danielle's inability or unwillingness to communicate

and interact with the Hydes. But communication breakdowns will inevitably occur when a parents and grandparents have had protracted litigation over the custody of a young child.

Petty recriminations are unfortunately common in custody and visitation situations. For instance, David's refusal to sit with the Hydes at W.L.'s graduation and Danielle's refusal to have coffee with Sarah are not ideal circumstances for W.L. Neither were David's and Danielle's repeated but unsubstantiated reports to child-protective service agencies. These facts might be relevant in a change-of-custody situation, but they have no bearing on David's ability to provide for W.L.'s basic needs. The clear testimony was that David was financially stable, caring, and stood ready to give her a home and provide for all of her needs.

Moreover, to deny David's petition to terminate the guardianship would result in totally ignoring the positive steps he has taken since first consenting to the guardianship. In *Devine v. Martens*, we noted that courts considering guardianship cases should encourage and recognize a parent's efforts to improve her home and parenting skills. 371 Ark. at 74, 263 S.W.3d at 526. There, the circuit court granted a guardianship petition filed by grandparents after finding that the parent was unfit. The circuit court's unfitness finding was based on environmental neglect, educational neglect, questionable moral guidance, and abandonment. We reversed, holding that the parent had taken "significant action toward rectifying any issues that would keep her from retaining custody of her son." *Id*.

We noted that in guardianship cases, like dependency-neglect cases, the courts should recognize and encourage parental improvement.

Like the parent in *Devine*, David has taken significant steps to correct any issues that would keep him from having custody of W.L. In this case, when the first termination-of-guardianship case happened, the court refused to terminate because David had not been providing for W.L.'s material needs and lacked a significant relationship with W.L. These problems have since been rectified. David has a full-time job; he has been in a three-year, committed relationship with his new wife Danielle; and since the first hearing, he has visited Arkansas eighteen times to see W.L. and communicates with her through phone calls multiple times per week. W.L. has even spent two, six-week summer vacations with David in Virginia. Plainly stated, if the court authorizes a parent to have extended, unsupervised, and out-of-state visitation, then that provides strong evidence that the parent is fit.

Finally, consensual guardianships serve a valuable purpose. An otherwise fit parent who is struggling may recognize that, for a period of time, the child might be better off with another caregiver while the parent deals with his or her challenges. This parent should not then be punished for that foresight by making it an impossible burden to regain custody of that child. In this case, this young, single, fit father was financially insecure and did not have medical insurance for W.L. and consented to a guardianship for his daughter's benefit. Within one year, he stepped forward and had achieved stability in all

respects. He should not have had to spend five years and tens of thousands of dollars in traveling expenses before regaining custody of his daughter.

Summing up, the court clearly erred in finding that David was an unfit parent. He is a fit parent, and this court is left with a firm conviction that a mistake was made. Since David is a fit parent, the circuit court should have terminated the guardianship once David revoked his consent to it.[6] Once the guardianship was terminated, the court then should have determined which parent was the proper custodian since David and Sarah had filed competing petitions for custody. It is clear that the court erred by denying David's petition for custody of W.L. The court found Sarah, W.L.'s mother, unfit. Sarah did not appeal this or any other ruling, so this finding is law of the case. *See K.S. v. State*, 343 Ark. 59, 31 S.W.3d 849 (2000). A fit parent (David) should get custody of a child over an unfit parent (Sarah). We therefore reverse and remand for the court to enter an order terminating guardianship and granting custody of W.L. to David.

Reversed and remanded; court of appeals opinion vacated.

HANNAH, C.J., and DANIELSON, J., dissent.

**PAUL E. DANIELSON, JUSTICE, dissenting.** I respectfully dissent. Yet again, a majority of this court has chosen to disregard our standard of review and substitute its judgment for that of the circuit court. In doing so, it has rejected any deference whatsoever to the circuit court, which was clearly in the superior position to determine

---

[6]The dissent points out that the statute leaves the trial court with discretion even when the conditions necessitating guardianship no longer exist. This is a correct statement of the law; however, there were no other facts in front of the court that could overcome David's fundamental right to raise his child.

credibility based on its ability and opportunity to observe W.L., her parents, and her guardians.

The case law governing guardianships has become nothing more than a constantly moving target,[1] which, in the instant case, has resulted in the circuit court, the parties, and a young child being whipsawed. Despite having followed this court's precedent at the time of its order, the circuit court is now overturned for reasons it would have been unable to foresee but for a crystal ball. Not only does today's majority opinion completely change the procedure for determining whether to terminate a guardianship, it does so based on a fundamental misreading of the statute.

While the majority purports to adhere to the statutory text, it does not do so. According to today's decision, the instant a fit parent has revoked consent to a guardianship, the guardianship becomes no longer necessary, and the circuit court shall terminate that guardianship. But that is in no way what the statute dictates.

The plain language of subsection (b)(3) of Arkansas Code Annotated § 28-65-401 (Repl. 2012), provides that "[a] guardianship *may* be terminated by court order after such notice as the court may require: . . . [i]f, for any other reason, the guardianship is no longer necessary or for the best interest of the ward." Ark. Code Ann. § 28-65-401(b)(3) (emphasis added). In other words, the statute clearly bestows discretion on the circuit

---

[1]Having established our standard in these matters in *In re Guardianship of S.H.*, 2012 Ark. 245, 409 S.W.3d 307 (*S.H. I*), a majority of this court then "clarif[ied]" that standard in April of this same year, *In re Guardianship of S.H.*, 2015 Ark. 75, at 5, 455 S.W.3d 313, 317 (*S.H. II*), and now, less than three months later, abrogates that standard entirely.

SLIP OPINION

court when determining whether to terminate a guardianship; it absolutely does not mandate that the guardianship *shall* be terminated upon revocation of consent, as the majority appears to hold.[2]  *See, e.g.*, *Marcum v. Wengert*, 344 Ark. 153, 164, 40 S.W.3d 230, 237 (2001) ("The word 'may' is usually employed as implying permissive or discretional, rather than mandatory, action or conduct and is construed in a permissive sense unless necessary to give effect to an intent to which it is used.").

As it now stands, the circuit courts of this state will oversee consensual guardianships in name only, as the discretion given by the General Assembly to the circuit courts to terminate such guardianships has been completely eliminated.  The Supreme Court did not hold in *Troxel v. Granville*, 530 U.S. 57 (2000), that courts were without any discretion at all in such matters or that a fit parent's decision as to the care, custody, and control of a child is binding and without the ability to ever be challenged in any way. To the contrary, according to *Troxel*, "if a fit parent's decision . . . becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination."  530 U.S. at 70.

---

[2]Nor do I in any way agree with the majority's opinion that the revocation of consent to the guardianship alone sustains the no-longer-necessary basis for termination.  Under the majority's analysis today, whether a parent revokes consent to the guardianship just hours after giving consent or even a decade later, the circuit court must grant the petition to terminate without any further inquiry.  Certainly this could not have been the General Assembly's intent when it saw fit to provide for judicial supervision of guardianships in the first place.  *See* Ark. Code Ann. § 28-65-107(a) (Repl. 2012) ("The jurisdiction of the circuit court over all matters of guardianship . . . shall be exclusive, subject to the right of appeal.").

This court complied with *Troxel* and afforded the requisite special weight to parents who had consented to a guardianship when we first adopted the standard for determining whether to terminate a guardianship in *S.H. I*, 2012 Ark. 245, 409 S.W.3d 307. It was a very workable standard that I believe allowed a circuit court to give weight to the parent's fundamental rights and take into consideration the child's interests. But, in addition, it complied with the General Assembly's grant of some discretion to the circuit courts of this state in deciding whether to terminate a guardianship.

Because I believe that this court's standard set forth in *S.H. I* was not only the appropriate one but also in full compliance with the dictates of our termination statute and *Troxel*, I strongly dissent from the majority's overruling of that standard. Because I believe that the circuit court did not clearly err in making its determinations under that standard, I would affirm the circuit court's order.[3]

HANNAH, C.J., joins.

*Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor* and *Tasha C. Taylor*, for appellant.

*Clark & Murdoch, P.A.*, by: *Timothy W. Murdoch*, for appellee.

---

[3]For the reasons I have set forth in prior opinions, I further note the danger in the majority's directive to award custody to David forthwith when it does not have the benefit of knowing the events and circumstances since entry of the circuit court's order in 2013. *See S.H. II*, 2015 Ark. 75, 455 S.W.3d 313 (Danielson, J., dissenting); *Ingle v. Ark. Dep't of Human Servs.*, 2014 Ark. 53, 431 S.W.3d 303 (Danielson, J., concurring in part and dissenting in part).